UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

00 JUN 20 AM 8:05

U.S. DISTRICT COURT
N.D. OF ALABAMA

JAMES LANFORD,                    )
                                  )
        Plaintiff,                )
                                  )
vs.                               )   Civil Action No. CV-99-S-508-NE
                                  )
TAYLOR-WHARTON COYNE,             )
                                  )   **ENTERED**
        Defendant.                )
                                      JUN 20 2000

### MEMORANDUM OPINION

Plaintiff commenced this action on March 3, 1999, alleging that defendant, his former employer, discriminated against him on the basis of his age by eliminating his position as the second-shift production supervisor. He brings his claim of disparate treatment under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et* seq. The action presently is before the court on defendant's motion for summary judgment. Upon consideration of the motion, briefs, evidentiary submissions, and pleadings, this court concludes the motion is due to be denied.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the



moving party is entitled to judgment as a matter of law. ..."
(Emphasis added.)   The movant bears the initial burden of showing
the court, by reference to materials on file, that no genuine
issues of material fact exist to be decided at trial.   *See Celotex
Corp*. *v. Catrett* , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265
(1986); *Clark v. Coats & Clark, Inc*., 929 F.2d 604 (11th Cir.
1991).   The moving party discharges this burden by "showing" or
"pointing out" to the court that there is an absence of evidence to
support the non-moving party's case.   *Jeffery v. Sarasota White
Sox, Inc*., 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*).   Rule 56
permits the movant to discharge this burden with or without
supporting affidavits.   *See Celotex*, 477 U.S. at 324, 106 S.Ct. at
2553.   When the moving party has discharged its burden, the non-
movant must go beyond the pleadings and designate specific facts
showing there is a genuine issue for trial.   *See Jeffery*, 64 F.3d
at 593.

In deciding whether the moving party has met its burden, the
court is obligated to draw all inferences from the evidence
presented in the light most favorable to the non-movant and, also,
to resolve all reasonable doubts in that party's favor.   *See Spence
v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).   Inferences in favor

of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence <u>could</u> draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

3

With the foregoing standards in mind, the following facts either are not disputed, or are stated in the light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Defendant is engaged in the business of manufacturing cylinders to hold acetylene and other gases under high-pressure.[1]  Defendant purchased a production facility in Huntsville, Alabama from Thermadyne Holding Corporation during April of 1996.[2]  Defendant thereafter extended employment offers to many of Thermadyne's former employees, including plaintiff.[3]  Thermadyne had hired plaintiff in 1977, as a "production worker" for the Huntsville plant.[4]  During succeeding years, plaintiff had been promoted to the position of "second-shift pressing supervisor."[5]  Defendant offered plaintiff the identical position he held with Thermadyne.[6]

In late 1997 and early 1998, Michael C. Camp, defendant's general manager, decided to partially reorganize the Huntsville facility by eliminating five to seven full-time positions, as well

---

[1] Camp's affidavit ¶ 2.

[2] *Id.* ¶ 3.

[3] *Id.* ¶ 4; Camp's deposition 67.

[4] Plaintiff's deposition at 12.

[5] *Id.* at 42.

[6] *Id.* at 42-43, 78.

as "downgrading" three supervisory positions.[7] Camp claims to have been motivated by two concerns.   First, Camp was "getting information from [his] corporate line regarding the economy and the need to basically resize our organization in preparation for a downturn, which did occur."[8]   Secondly, Camp wanted to reduce the number of supervisors who would be responsible for communicating company policies and disciplining employees.[9] This latter concern was fueled by an attempt to unionize defendant's Huntsville workforce.[10] Although the unionization effort was unsuccessful, it accentuated the need for improved communication of company policies to employees.

> Q.      ... Are [you] saying that ... the labor unrest was
>         symptomatic or demonstrated that there was a poor
>         communication between management and rank and file,
>         and something needed to be done about it and
>         therefore the reorganization?
>
> A.      I think in the process of listening ... having
>         meetings with employees, listening to what the issues
>         were — I determined that communication was a
>         weakness, that information was not getting properly
>         distributed, there was [sic] perceptions of issues
>         that really weren't issues.   It was a failure
>         basically within our leadership ranks to s[i]t in the
>         meeting and discuss policy and take that policy to
>         the floor and communicate it consistently from

---

[7] Camp's deposition at 57.

[8] *Id.* at 8.

[9] *Id.* at 13-14.

[10] *Id.* at 11-12.

department to department.[11]

As part of this restructuring effort, Camp eliminated plaintiff's position on April 20, 1998, as well as the supervisory positions filled by K. D. Moore and James McElyea.[12]  Plaintiff, Moore, and McElgea were the oldest employees at the Huntsville facility.[13]  Camp admitted that he targeted his reorganizational efforts on these three supervisory positions, but argues that he did so because plaintiff, Moore, and McElyea had displayed problems communicating with their employees.[14]  Specifically, Camp was disheartened that plaintiff had told another employee, Dennis Pendal, that the company would not allow him to be a lead man because of his union activity.[15]  Plaintiff admits the incident occurred, but insists that he acted in accordance with the instructions of K. D. Moore, one of his supervisors.[16]

> Q.    Tell me about the incident [involving Dennis Pendal].
>
> A.    This is when they took me up there and talked to me about Dennis having the lawsuit against the company. Dennis Pendal, he was my lead man.

---

[11] *Id.* at 13-14.

[12] *Id.* at 27.

[13] *Id.* at 28.

[14] *Id.* at 15.

[15] *Id.* at 39; plaintiff's deposition at 105-111.

[16] K. D. Moore's exact title prior to reorganization was that of first-shift pressing supervisor, and plaintiff testified that Moore was two years older than he and had more seniority with the company. *See* plaintiff's deposition at 115-116.

> And they told us that he had — well, he had tried to get a union started is really what it boiled down to. And K. D. Moore came to me and told me to tell Dennis that he could no longer be my lead man because he was for the union.
>
> I took Dennis outside and told Dennis those exact words, as best I can remember it.
>
> . . .
>
> Q.   What did you tell Dennis Pendal when you took him outside?
>
> A.   I told him that K. D. told me to tell him that he could not be my lead man anymore, because of his union activity that he couldn't be in any part of supervision.
>
> Q.   Who told you to tell him he couldn't be a supervisor any longer?
>
> A.   My supervisor.
>
> Q.   Who was K. D. Moore?
>
> A.   Right.[17]

Defendant offered plaintiff, Moore, and McElyea the option of either retiring from their employment with a severance package, or transferring into "group leader" positions.  The group leader positions were only hourly-paid positions, and resulted in a three to five percent decrease in pay (depending on the amount of overtime worked by the employee) from the salary-based supervisory positions each then held.[18]  The new positions also required

---

[17] Plaintiff's deposition at 105-107.

[18] *Id.* at 70-71.

employees to handle some, but not all, of the supervisor's former

responsibilities.[19]        Camp     explained     the     difference     in

responsibilities:

> Q.    What is the difference between the responsibility of
>       a supervisor versus the responsibility of a group
>       leader?
>
> . . .
>
> A.    Okay.   At the time of the reorganization the
>       supervisor basically managed the floor, or the
>       employees within his department, scheduling,
>       planning, as well as communication of policy and
>       issues, disciplinary practice and needs.  The intent
>       with the group leader was to continue with the floor
>       activities, but due to the concerns I had over
>       communications and proper communication of policy and
>       handling of — consistently handing disciplinary
>       issues, the group leader would not have authority to
>       do those things, policy communication or
>       disciplinaries.  They would report to a supervisor or
>       superintendent who would do those things.
>
> . . .
>
> Q.    Before the reorganization, did supervisors have the
>       authority to terminate an employee?
>
> A.    No.
>
> Q.    Or to discipline employees?
>
> A.    Yes.
>
> Q.    And after the reorganization they only had that
>       authority after approval of the production
>       superintendent?

---

[19] *Id.* at 18-28.

A.    They could not actually perform that function. ...

...

Q.    Prior to the reorganization, did the supervisors have the authority to communicate company policy?

A.    ... Yes, they did.

Q.    And after the reorg. [sic], did they have the authority to communicate company policy...?

A.    Only in the absence of the superintendent.

Q.    But as far as day-to-day operations and getting the work done, the old job of supervisor was essentially the same as the new job of group leader; is that right?

A.    Essentially from the standpoint of the floor responsibilities.   Totally different from the standpoint of what communication and disciplinary responsibilities were placed on the job.[20]

Plaintiff and Moore declined the option of continued employment, but McElyea accepted the "transfer" into a group leader position.[21] After plaintiff accepted the offer of early retirement, defendant promoted Danny Heatherly, a much younger employee,[22] to the second-shift group leader position.[23]   In June of 1998, two months after plaintiff's position was eliminated, Camp also eliminated all of

---

[20] Camp's deposition at 23-27.

[21] Plaintiff's deposition at 73-76.

[22] Camp estimated that Weatherly was in his "thirties to forties." Camp's deposition at 33.

[23] Id. at 32-33.

his 30 to 35 part-time positions.[24]

### III.  DISCUSSION

Congress enacted the Age Discrimination in Employment Act (ADEA) in 1967 to protect older Americans from discrimination in the workplace.  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *see* 29 U.S.C. §§ 621(b), 623.  Under the ADEA, it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...."  29 U.S.C. § 623(a)(1).

In ADEA cases, the plaintiff has the ultimate burden of proving that age was a determinative factor in the employer's adverse employment decision.  *See, e.g., Verbraeken v. Westinghouse Electric Corporation*, 881 F.2d 1041, 1045 (11th Cir. 1989).  Initially, the plaintiff must establish that age was a determining factor with direct evidence,[25] circumstantial evidence, or statistical evidence.  *See Alphin v. Sears, Roebuck & Company*, 940 F.2d 1497, 1500 (11th Cir. 1991).  The evaluation of a plaintiff's

---

[24] *Id.* at 57-58.

[25] "Only the most blatant remarks, whose intent could only be to discriminate on the basis of age constitute direct evidence."  Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1226 (11th Cir. 1992).

evidence of the employer's intent differs, depending upon which form of proof is used.  Plaintiff attempts to use all three.

## A. Statistical Evidence of Discrimination

Statistical evidence can be an appropriate method for demonstrating both a prima facie case of discrimination and pretext in a case founded on the ADEA.  *See Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308, 1314-1315 (11th Cir. 1998); *Meadow v. Procter & Gamble Company, Inc.*, 107 F.3d 846, 850-852 (11th Cir. 1997); *Early v. Champion International Corp.*, 907 F.2d 1077, 1079-81 (11th Cir. 1990).

Of the three forms of proof, statistical evidence has the least probative value in disparate treatment cases prosecuted by an individual plaintiff.  The Eleventh Circuit holds that "statistics alone cannot make a case of individual disparate treatment." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 n.5 (11th Cir. 1998) (quoting *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984) (distinguishing individual cases from class action cases where statistics, if strong enough, can carry the plaintiff class' initial burden of production in the establishment of a prima facie case) (internal quotation marks omitted)).  *See also Combs v. Plantation Patterns*, 106 F.3d 1519,

1527 n.3 (11th Cir. 1997) (rejecting plaintiff's statistical evidence as "undeveloped and without analytical foundation"), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 952-53 (11th Cir. 1991) (noting that statistics without analytical foundation are "virtually meaningless"), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992).

Plaintiff alleges that, "since 1991, Defendant has been engaged in a pattern and practice of systematically eliminating the older persons in its workplace."[26]  Plaintiff abandoned his pattern and practice allegations by failing to supply statistical evidence of discrimination.  Indeed, the only statistical evidence submitted to the court was supplied by defendant, in support of its contention that it has not intentionally discriminated against employees on the basis of their age.  Specifically, defendant furnished the affidavit of Loren R. Traylor, its human resources manager, who supplied the following information:

> 3.     During the period from 1996 to October 22, 1999, [defendant] involuntarily terminated 32 employees from the Huntsville plant, including Plaintiff. These employees' average age at termination was 38.25.
>
> 4.     As of April 1, 1998, the average age of [defendant's]

---

[26] Plaintiff's complaint ¶ 7.

work force at the Huntsville plant was 38.

5.      As of March 11, 1999, the average age of the work
        force at the Huntsville plant was 38.16.[27]

Plaintiff has not attempted to refute those statistics.

Accordingly, the court concludes that plaintiff cannot establish a

prima facie case of age discrimination with statistical evidence.[28]

---

[27] Defendant's exhibit E at ¶¶ 3-5.

[28] The court also notes that plaintiff cannot assert a true "pattern and
practice" claim because his complaint does not contain the requisite class
allegations.

> Pattern-or-practice suits, by their very nature, involve claims of
> classwide discrimination.  Such claims involve an allegation that
> the defendant's actions constitute a pattern of conduct in which the
> defendant intentionally has discriminated against the plaintiff's
> protected class.

1 Barbara Lindermann & Paul Grossman, Employment Discrimination Law at 44 n. 168
(3d ed. 1996); see also Mooney v. Aramco Services Co., 54 F.3d 1207, 1219 (5th
Cir. 1995) (discussing the elements of an ADEA "pattern and practice" claim).

> Moreover, plaintiff did not file a written consent as required by 29 U.S.C.
> § 626(b).  Although the ADEA permits the institution of class actions, see 29
> U.S.C. § 626(b), the ADEA incorporates by reference § 16(b) of the Fair Labor
> Standards Act of 1938, 29 U.S.C. § 216(b).  In commencing a class action under
> the FLSA, and thus under the ADEA, "[n]o employee shall be a party plaintiff to
> any such action unless he gives his consent in writing to become such a party and
> such consent is filed in the court in which such action is brought." 29 U.S.C.
> § 216(b).  The former Fifth Circuit has also explained the significance of
> initiating such a class action:

>> There is a fundamental, irreconcilable difference between the
>> class action described by Rule 23 and that provided for by FLSA §
>> 16(b).   In a Rule 23 proceeding a class is described;  if the
>> action is maintainable as a class action, each person within the
>> description is considered to be a class member and, as such, is
>> bound by judgment, whether favorable or unfavorable, unless he has
>> "opted out" of the suit.   Under § 16(b) of FLSA, on the other hand,
>> no person can become a party plaintiff and no person will be bound
>> by or may benefit from judgment unless he has affirmatively "opted
>> into" the class; that is, given his written, filed consent. ... It
>> is crystal clear that § 16(b) precludes pure Rule 23 class actions
>> in FLSA suits.

## B. **Direct Evidence of Discrimination**

Plaintiff also has not produced direct evidence of defendant's intent to discriminate. Direct evidence is evidence which, if believed, proves the existence of a fact in issue without the need of an inference or a presumption. *See, e.g., Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require ... an inferential leap between fact and conclusion."); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (defining direct evidence as "evidence, which if believed, proves existence of fact in issue without inference or presumption"); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same); *Black's Law Dictionary* 577 (7th ed. 1999) (defining direct evidence as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or

---

LaChapelle v. Owens Illinois, Inc., 513 F.2d 286, 288 (5th Cir. 1975) (emphasis supplied); *see also* Grayson v. K Mart Corporation, 79 F.3d 1086, 1096 n.12 (11th Cir. 1996) (stating that "it is clear that the requirements for pursuing a [FLSA] class action are independent of, and unrelated to, the requirements for class action under Rule 23 of the Federal Rules of Civil Procedure"); Whalen v. W.R. Grace & Co., 56 F.3d 504, 506 n.3 (3rd Cir. 1995) (concluding that "[u]nlike a class action under Fed. R. Civ. P. 23, under [the FLSA], no person can become a party plaintiff and no person will be bound by or may benefit from a judgment unless he or she has affirmatively 'opted into' the class by filing a written consent with the court..."). Accordingly, to the extent that plaintiff has attempted to characterize his "pattern and practice" allegation as a separate cause of action, it is due to be dismissed. At most, plaintiff may use "pattern and practice" evidence as support for an individual disparate treatment claim.

presumption."). The Eleventh Circuit provided some examples to mark the cleavage between direct and circumstantial evidence in *Rollins*:

> One example of direct evidence would be a scrap of paper saying, "Fire Rollins — she is too old." *See Williams* [*v. General Motors Corp.*], 656 F.2d [120,] at 130 [(5th Cir. Unit B 1981)]. This court found that there was direct evidence of discrimination when an INS reviewing committee set aside a female applicant's file without reviewing it because the two men knew the director would not consider hiring a woman investigator. *Lewis v. Smith*, 731 F.2d 1535 (11th Cir. 1984). In these instances, the fact that the evidence exists, by itself, proves the discrimination. The evidence at issue here, on the other hand, suggests discrimination. The trier of fact must infer discrimination based on the evidence. By definition, then, it is circumstantial evidence.

*Rollins*, 833 F.2d at 1528 n.6.

Direct evidence has the greatest probative value. When a plaintiff establishes by direct evidence that a contested employment decision was motivated by a discriminatory animus, the employer "may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's [age] into account." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989) (gender discrimination); *see also, e.g., Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998); *Haynes v. W.C. Caye and Co., Inc.*,

15

52 F.3d 928, 931 n.8 (11th Cir. 1995).  In other words, "defendant

must prove that there was a separate, [age] neutral reason for its

[contested employment decision]."   *E.E.O.C. v. Alton Packaging

Corp.*, 901 F.2d 920, 925 (11th Cir. 1990).

> In a direct evidence case, the plaintiff must produce direct
> testimony that the employer acted with discriminatory
> motive, and must convince the trier of fact to accept the
> testimony.  If the plaintiff produces such evidence and the
> trier of fact believes it, the defendant must prove by a
> preponderance of the evidence that the defendant would have
> reached the same decision without the factor proved.  In
> other words, the employer must prove that even if it had not
> taken race into account, it would have come to the same
> decision.

*Id.*, 901 F.2d at 923 (citations omitted).[29]

Thus, the characterization of evidence as direct "dramatically

affects the allocation of the evidentiary burdens."  *Carter v.*

*Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir.

1998).  "When there is direct evidence that discrimination was a

motivating factor in the challenged employment decision, the

appropriate analysis is different from that employed in a case

where only circumstantial evidence is available."  *Trotter v. Board*

*of Trustees of the University of Alabama*, 91 F.3d 1449, 1453 (11th

---

[29] *See also, e.g.*, Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir.
1985) ("'Once an unconstitutional motive is proved to have been a significant or
substantial factor in an employment decision, defendant can rebut only by proving
by a preponderance of the evidence that the same decision would have been reached
even absent the presence of that factor.'") (*quoting* Lee v. Russell County Board
of Education, 684 F.2d 769, 774 (11th Cir. 1982)).

Cir. 1996) (citing *Bell v. Birmingham Linen Service*, 715 F.2d 1552,

1556 (11th Cir. 1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385,

81 L.Ed.2d 344 (1984); *Haynes v. W.C. Caye and Co., Inc.*, 52 F.3d

928, 931 (11th Cir. 1995)). "By producing direct evidence, the

plaintiff effectively shifts the burden of proof to the defendant,

who must then show that there was no discrimination. It is rare

that direct evidence of discrimination exists, however." *Rollins

v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987).[30]

Statements of decisionmakers directly related to the contested

employment action constitute direct evidence of discrimination.

*See, e.g., Carter*, 132 F.3d at 641 ("[D]irect evidence relates to

actions or statements of an employer reflecting a discriminatory or

retaliatory attitude correlating to the discrimination or

retaliation complained of by the employee.") (quoting *Caban-Wheeler

v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990) (internal quotation

marks omitted)); *Trotter*, 91 F.3d at 1453 ("Statements indicating

... bias on the part of a decisionmaker in an employment setting

---

[30] *See also, e.g.*, Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 950 (11th Cir. 1991) (§ 1981 case noting that, "seldom is there direct evidence of intentional racial discrimination"); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1981) (stating that *McDonnell Douglas* test is designed to ease burdens on discrimination plaintiffs when direct evidence of discrimination is lacking); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 11184 (11th Cir. 1984) ("Because direct evidence of discriminatory animus can be difficult to produce, it is often appropriate to analyze circumstantial evidence of discrimination according to the three-step procedure first developed in *McDonnell Douglas Corp. v. Green*, ....").

can constitute direct evidence of ... discrimination in Title VII cases.") (citations omitted); *Bell*, 715 F.2d 1552 (plaintiff's supervisor voiced bias to plaintiff at the very moment he rejected plaintiff for promotion); *Thompkins v. Morris Brown College*, 752 F.2d 558, 561, 563-64 (11th Cir. 1985) (statement by decisionmaker that he saw no need for a woman to have a second job constituted direct evidence of discriminatory intent).

On the other hand, statements that do "not relate directly to the decision" in dispute, or "statements that are open to more than one interpretation do not constitute direct evidence of ... discrimination." *Carter*, 132 F.3d at 642; *see also Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996)(statements that could "have more than one possible meaning" are not direct evidence of discrimination). "Only the most blatant remarks, whose intent could only be to discriminate on the basis of [an impermissible factor] constitute direct evidence." *Coats v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1992). Evidence merely suggesting discrimination is not sufficient. *See Earley v. Champion International Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990).

Moreover, "stray remarks in the workplace," "statements by

nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" do not "justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804-05 (O'Connor, J., concurring).

For example, in *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir. 1990), the employer's general manager (Robert Raymond) allegedly said "if [Alton Packaging] was his company, he wouldn't hire any black people." *Id.*, 901 F.2d at 922. In addition, the production manager (Robert Diesen) allegedly yelled at one black employee "--- ---- it, you people can't do a ------- thing right." *Id.* The Eleventh Circuit held the former statement to be direct evidence of discriminatory intent by a decisionmaker, but the latter nothing more than a "stray remark," "unrelated to the decisional process itself."

> *Price Waterhouse* does not define direct evidence. In her concurrence, however, Justice O'Connor stated that "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" do not "justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse*, 109 S.Ct. at 1804. <u>Raymond's statement</u> that if it were his company he would not hire blacks does not fall into any of these categories. <u>Raymond</u> was a decisionmaker, and he made the remark in reference to hiring. [On the other hand,] <u>Diesen's statement</u> is the kind of stray remark

19

> contemplated by Justice O'Connor, but does not affect the outcome. <u>Raymond's statement</u> constituted direct evidence of discrimination which Alton was required to rebut by a preponderance of the evidence.   The district court erred when it failed to place this burden on Alton.

*Id.* (emphasis added).

Here, plaintiff testified that there was only one statement that he found offensive, and it was made by Gary Bilyeu, one of his supervisors.  Specifically, Bilyeu told plaintiff that he "ought to be thankful [he] had a job, that nowadays and times wouldn't nobody hire nobody like that."[31]

Bilyeu's comment does not constitute direct evidence of discrimination.   At most, this comment is a mere "stray remark" and, as plaintiff admitted during deposition, it is open to more than one interpretation.  Specifically, when plaintiff was asked to explain the meaning of Bilyeu's comment, he stated:

> Q.   What do you mean "like that"?
> A.   That's exactly what he said.
> Q.   Did you take from that that he was discriminating against you on the basis of your age?
> A.   Probably age, education, or something like that, yes.[32]

Moreover, although the statement was made by one of plaintiff's supervisors, Camp, not Bilyeu, ultimately decided to eliminate plaintiff's position.   Accordingly, plaintiff must prove that

---

[31] Plaintiff's deposition at 66.

[32] *Id.*

defendant   intended   to   discriminate   against   him   through
circumstantial evidence.

## C. Circumstantial Evidence of Discrimination

To  avoid  summary  judgment  on  an  age  discrimination  claim,  a
plaintiff relying on circumstantial evidence must comply with the
framework  that  the  Supreme  Court  announced  in  *McDonnell Douglas
Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973),
and then elaborated in its progeny.  *See St. Mary's Honor Center v.
Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas
Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct.
1089,  67  L.Ed.2d  207  (1981).   Under  that  framework,  the  plaintiff
bears  the  initial  burden  of  establishing  a  prima  facie  case  of
discrimination.   If a plaintiff does so, then at the second stage
of analysis the burden of production shifts to the defendant to
rebut the presumption[33] of intentional discrimination thus created
by  articulating  legitimate,  nondiscriminatory  reasons  for  the
contested employment action.  *See Burdine*, 450 U.S. at 253, 101
S.Ct.  at  1093.   If  a  defendant  carries  its  burden,  then  in  the
final  step  of  inquiry  the  plaintiff  must  have  an  opportunity  to

---

[33]*See* Walker v. Mortham, 158 F.3d 1177, 1185 n.10 (11th Cir. 1998), for an
excellent discussion of the reasons why presentation of a prima facie case
creates "a *presumption*, and not an *inference*, of intentional discrimination."
(Emphasis in original.)

"come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825). The plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct' ...." *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). The plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. duPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).

### 1.   Plaintiff's prima facie case

In order to establish a prima facie ADEA violation in the

22

termination of employment, a plaintiff generally must prove that he (1) was a member of the protected group of persons between the ages of forty and seventy, (2) was terminated, (3) was replaced with a person outside the protected class, and (4) was qualified to perform the duties of his job. *See Jameson v. Arrow Company*, 75 F.3d 1528, 1531 (11th Cir. 1996). The Eleventh Circuit has recognized, however, that this prima facie case is "altered slightly in both a reduction-in-force ('RIF') case and where a position is eliminated in its entirety...." *Jameson*, 75 F.3d at 1531. Under these circumstances, a plaintiff may establish a prima facie case by showing

> (1) that [h]e was in a protected age group and was adversely affected by an employment decision, (2) that [h]e was qualified for h[is] current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of age in reaching that decision.

*Id*. at 1532; *see also Watkins*, 153 F.3d at 1314; *Maddow*, 107 F.3d at 851; *Hedrick v. Hercules, Inc.*, 658 F.2d 1088, 1094 (5th Cir. Unit B, Oct. 15, 1981).[34]

Applying this analysis to the present facts, the court finds that plaintiff has established a prima facie case of age

---

[34] In Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of the Unit B panel of the former Fifth Circuit handed down after September 30, 1981.

discrimination.  Plaintiff was sixty years old on the date his position was eliminated and, thus, falls within the protected age group.  He was subjected to an adverse employment action when his position as the second-shift pressing supervisor was eliminated. Although defendant offered him the option of "transferring" into a position as "group leader," the new position  would have reduced plaintiff's pay, as well as his authority.  As such, it amounted to a demotion and, therefore, "a reasonable person in his position would view the employment action in question as adverse." *Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998) (applying ADEA and Title VII "adverse employment action" doctrine to a claim under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112(a), and acknowledging that an involuntary transfer can constitute an adverse employment action).  Moreover, plaintiff was qualified for the position of second-shift pressing supervisor. Defendant evaluated plaintiff's performance during October of 1996 and March of 1997, and on each occasion awarded plaintiff an overall rating of competent.[35]  Even though plaintiff received a lower evaluation during November of 1997, plaintiff disputes the

---

[35] Defendant's evaluation form listed five possible ratings, ranging from unsatisfactory to exceptional, with competent being the middle score.  Bilyeu's deposition at exhibit A.

reasons advanced by defendant for his lower rating,[36] and the court construes these inferences in favor of plaintiff.  If plaintiff's performance had been completely unsatisfactory, defendant would not have offered him another position but, instead, would have terminated his employment outright.  Finally, plaintiff has adduced strong circumstantial evidence of age discrimination. Specifically, the court finds it particularly disconcerting that Camp intentionally eliminated the positions held by the three oldest employees in the Huntsville facility.  Accordingly, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for that decision.

## 2. Defendant's legitimate, nondiscriminatory reasons

Defendant argues that plaintiff's termination was not based upon his age, but upon a desire to improve communication between management and employees.[37]  Specifically, as discussed in section II *supra*, defendant criticizes the manner in which plaintiff handled a conversation with Dennis Pendal, an employee involved in an internal labor movement to unionize workers at the Huntsville facility.  Additionally, defendant contends that its restructuring effort was precipitated by an anticipated economic "downturn."

---

[36] Plaintiff's deposition at 85-95.

[37] *See* defendant's brief (doc. no. 20) ¶ 12, admitting that the economic issues were secondary to the communication issues.

The court finds that defendant has met its intermediate burden of production, and effectively rebutted the burden of discrimination raised by plaintiff's prima facie case.  Thus, the burden shifts to plaintiff to demonstrate pretext.

### 3.    Plaintiff's showing of pretext

"The defendant's 'production' (whatever its persuasive effect) having been made," *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749, "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1095.

> [T]he "new level of specificity" ... refer[s] to the fact that the inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced.

*Hicks*, 509 U.S. at 516, 113 S.Ct. at 2752.

At this third level of analysis, plaintiff must be afforded the opportunity to discredit defendant's proffered explanations for the contested employment decision, and to show that it is but a pretext for discrimination.   "In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse

employment action." *Combs*, 106 F.3d at 1528; *see also Hicks*, 509 U.S. at 507-08, 113 S.Ct. at 2747-48 ("The plaintiff then has the full and fair opportunity to demonstrate, ... that the proffered reason was not the true reason for the employment decision, ... and that race [or age] was.  He retains that ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination.") (citations to *Burdine* and internal quotation marks omitted).

If the plaintiff succeeds in casting doubt upon the credibility of the explanations put forward by the defendant — in other words, "if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action" — then "it follows from *Hicks* that a plaintiff is entitled to survive summary judgment, and judgment as a matter of law...." *Combs*, 106 F.3d at 1529; *see also id*. at 1532 ("To summarize, ... this circuit's post-*Hicks* decisions uniformly hold that once a plaintiff has established a prima facie case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude [summary judgment or] entry of judgment as a matter of law.").

27

The court finds that plaintiff has cast doubt upon defendant's alleged, nondiscriminatory reasons.  With regard to defendant's argument that plaintiff lacked sufficient communication skills and mishandled a situation with Dennis Pendal, plaintiff testified that he was specifically instructed by his supervisor to convey that message to Pendal, and argues that he should not be punished for just "do[ing] what my supervisor told me to do."[38]  As to the anticipated economic downturn, the court fails to understand how the elimination of three pressing supervisor positions could drastically alter defendant's budget, especially in light of the fact that defendant offered all three employees other positions in which their compensation was reduced by only three to five percent.  Although defendant did eliminate 30 to 35 part-time positions, it did not do so until June of 1998, several months after it announced the decision to restructure the supervisory positions.[39]

### IV.  CONCLUSION

Accordingly, defendant's motion for summary judgment is due to be denied, and plaintiff is entitled to present his case to a jury. An order consistent with this memorandum opinion will be entered

---

[38] Plaintiff's deposition at 108.

[39] In a series of memorandum between Camp and his corporate headquarters in late 1997 and early 1998, the court notes that he justifies the elimination of each pressing supervisor, but never mentions the possibility that any part time employees will be terminated.

contemporaneously herewith.

DONE this _20ᵗʰ_ day of June, 2000.

United States District Judge